**AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE IN REM**

I, Jason Rameaka, being duly deposed and sworn, say:

1. I am a Special Agent with Criminal Investigation, Internal Revenue Service, United States Department of the Treasury, and have been so employed since April of 2000. I received training in conducting financial investigations, and I am familiar with the procedures of the Internal Revenue Service. My function as a Special Agent is to investigate criminal violations of the Internal Revenue laws, including tax and money laundering offenses. Prior to my career as a Special Agent, I worked as a Revenue Agent for 9 years.

2. This Affidavit is based on my own personal observations and participation in this investigation, my conversations with other law enforcement officers who have participated in this investigation, interviews with witnesses, and reviews of reports, documents, and other evidence obtained during the investigation. This Affidavit does not contain every detail of this investigation; rather, it contains those facts that I believe are necessary and sufficient to establish probable cause and a reasonable basis, consistent with Rule G(2)(f) of the Federal Rules of Civil Procedure, to believe that the below listed properties – a bank account and five pieces of real property – are subject to forfeiture to the United States and/or that the United States would be able to meet its burden of proof at trial.

## I. INTRODUCTION

3. Since approximately August 2007, I participated in an investigation of fraudulent activities by Dr. Tarek Wehbe ("Dr. Wehbe"). As more fully explained below, Dr. Wehbe is the President and owner of Renaissance Medical Group ("RMG"), a medical practice with offices in Providence and North Providence. Specifically, the investigation has uncovered evidence that Dr. Wehbe has been submitting fraudulent claims to Medicare, Medicaid, and private health insurance carriers in order to obtain reimbursements for services that were not rendered, medically unnecessary, and likely upcoded in violation of 18 U.S.C. §§ 1347 (health care fraud), 1341 (mail fraud), 1343 (wire fraud), and 1956 (money laundering).

4. I submit this Affidavit in support of a complaint for forfeiture in rem to be filed in the District of Rhode Island against the following:

(a) *Citizens Bank account number 994-984-4* in the name of Dr. Wehbe, [redacted] Pine Tree Lane [redacted]

(b) *Real property located at 1630 Mineral Spring Avenue, North Providence, Rhode Island* which is owned by Atlantis Management – located at [redacted] Pine Tree Lane, [redacted] and, based on my review of records, 99% of which is owned by Dr. Wehbe – and legally described as:

> Those six (6) certain lots or parcels of land with all buildings and Improvements thereon situated on the sourtherly side of Mineral Spring Avenue and the northerly side of Swanee Street in the Town of North Providence, County of Providence, State of Rhode Island laid out and designated as Lots Nos. 153 (one hundred fifty-three), 154 (one hundred fifty-four), 155 (one hundred fifty-five), 164 (one hundred sixty-four), 165 (one hundred sixty-five), 166 (one hundred sixty-six) on that plat entitiled "Wilbur Highlands North Providence, Rhode Island owned by J.W. Wilbur July 1, 1908 Scale 60 FT = 1 IN A.L. Eliot, C.E." which plat is recorded in the Office of the Town Clerk of said Town of North Providence on Plat Card 75.

(c) *Real property located at 566 East Shore Road, Jamestown, Rhode Island* which is owned by Dr. Wehbe and his wife Mathilda Wehbe and legally described as:

> That certain parcel of land, with any improvements thereon, in the Town of Jamestown and State of Rhode Island, on the easterly side of East Shore Road, and bounded and described as follows: Beginning at a point in the easterly line of said Road, said point of beginning being at the southwesterly corner of land now or formerly of Edwin Ohsberg and at the northwesterly corner of the within described parcel; Thence running southerly bounding westerly on said East Shore Road two hundred (200) feet, to a point; Thence turning an interior angle of 71 degrees 13' and running northeasterly three hundred ninety-two and 78/100 (392.78) feet to a point; Thence turning an interior angle of 224 degrees 01' and running southeasterly sixty-eight and 33/100 (68.33) feet to a wall, said last two (2) courses bounding southeasterly and southwesterly on land now or formerly or formerly Commerce Oil Refining Corporation, thence turning an interior angle of 83 degrees 10' and running northeasterly along said wall bounding southeasterly on Parcel II hereinafter described, two hundred (200) feet to an angle in said wall; thence turning an interior angle of 61 degrees 39' and running southwesterly along said wall bounding northwesterly said Ohsberg land five hundred four and 38/100 (504.38) feet to said East Shore Road and the point and place of beginning.

And further described as:

Also a certain parcel of land adjoining Parcel I on the southeast and bounding northwesterly on said Parcel I; southwesterly on land now formerly of Commerce Oil Refining Corporation on a line in extension southeasterly of the third course of said Parcel I; southeasterly on Narragansett Bay; and northwesterly on a line in extension northeasterly of the last described course of said Parcel I.

(d) *Real property located at 6 Pine Tree Lane, Lincoln, Rhode Island* which is owned by Dr. Wehbe and his wife Mathilda Wehbe and legally described as:

That certain lot or parcel of land with all the buildings and improvements thereon, situated on Pine Tree Lane, in the Town of Lincoln, County of Providence, State of Rhode Island, laid out and designated as Record Lot 6 on that certain plat entitled, "Gaywood Record Plan AP 26 Lot 64, Lincoln, Rhode Island Developer: Dayjur Corporation, 145 Twin River Road, Lincoln, Rhode Island 20865 Owner: Dayjur Corporation, 145 Twin River Road, Lincoln, Rhode Island 02865" which plat is recorded in the Land Evidence Records of the Town of Lincoln County of Providence, State of Rhode Island as Subdivision No. 325.

(e) *Real property located at 15 Dennell Drive, Lincoln, Rhode Island* which is owned by Elegant Homes – located at [redacted] Pine Tree Lane [redacted]and, based on my review of records, 25% of which is owned by Dr. Wehbe – and legally described as:

Two certain tracts or parcels of land, located in the rear of the Comstock Farm, in the Town of Lincoln, County of Providence, State of Rhode Island, and bounded and described as follows: The first lot begins at the north-west corner of said lot, at a stone; a bound of land formerly owned by Mary Burgess, wife of Tristam Burgess; thence running S. 84 ½ ° E. and bounded northerly by land now or formerly of the Estate of Anthony Angell, thirty six (36) rods, and twenty-two (22) links, to an old chestnut stump; thence running S. 86 ° E with said Angell land, four (4) rods, and eight (8) links, to a stone set in the ground; thence running S. 2° W., two (2) rods, to a corner of land formerly belonging to the Heirs of Joseph Whipple; thence running S. 16 ½ ° E., bounded easterly by said Whipple land; fourteen (14) rods, and five (5) links, to a corner of land formerly belonging to the Heirs of Nathaniel Angell; thence running S. 64 ° W., with said Angell land, to a stone bound at the corner of the above named Burgess land; thence running N. 20° W., bounded westerly by said Burgess land, about thirty-seven (37) rods to the point of beginning, and contains about five and ¾ (5-3/4) acres of land.

The second lot begins at a stone set in the ground at the south-west corner of the first tract hereinbefore described ; thence running S. 64° W., twenty-two (22) rods, and ten (10) links, to stake and stones; thence running westerly about five hundred ninety (590) feet to a stone at the south-west corner of this lot; thence running N. 4° E., twenty-one (21) rods and twenty-six (26) links, to a stone; thence running N. 36° E., nine and ½ (9-1/2) rods to a stone; thence running N. 4° E., three (3) and ten (10) links, to a stone at the north-west corner of the first tract hereinbefore described; thence running southerly bounded easterly by said first tract, about thirty-seven (37) rods to the point of beginning, and contains about twelve and ¼ (12-1/4) Acres of land.

Also, a certain triangular tract of land, lying westerly from the Louisquisset Pike in the Town of Lincoln, County of Providence, in the State of Rhode Island, and is bounded and described as follows:

Beginning at the northeasterly corner of the within described land at a stone, and being a corner of land now or lately of Anna B. Comstock and land now or formerly of Jennie Cimini; thence S. 65° E. bounding northeasterly by land now or lately of Anna B. Comstock and land now or lately of Jennie Cimini, five hundred and thirty-two (532) feet to an iron pope in the ground; thence N. 88° W. bounding southerly by land now or lately of Jennie Cimini four hundred and thirtyeight (438) feet to an iron pope set in the ground at the southeasterly corner of land now or lately of Jennie Cimini; thence N. 12° E. two hundred and thirty (230) feet to the place of beginning and containing 1.13 acres, more or less.

Excluding from the above parcels the premises conveyed by Albina Lems to Daniel J. Sullivan Jr. and Kathleen M. Sullivan by deed dated September 15, 1993 and recorded in Book 386 at Page 83.

(f) *Real property located at 78 Farnum Pike, Smithfield, Rhode Island and further designated as Condominium Units # 2, #4, #5, #6 and #7* which is owned by Summerfield Estates – located at [redacted] Pine Tree Lane [redacted] and, based on my review of records, 50% of which is owned by Dr. Wehbe – and legally described as follows:

That certain lot or parcel of land with all the buildings and improvements thereon situated on the southwesterly side of Farnum Pike and on the northwesterly side of Wolf Hill Road in

> the town of Smithfield, County of Providence, and State of Rhode Island, bounded and described as follows;
>
> Beginning at the easterly corner of said lot at the westerly corner of said Farnum Pike and Wolf Hill Road; thence southwesterly bounding southwesterly on said Wolf Hill Road about 103.8 feet to land now or lately of St Michael's Church, Georgiaville, Rhode Island; thence northwesterly bounding southwesterly on the last named land about 121 feet to a corner; thence northeasterly bounding northwesterly on other land now or lately of St. Michael's Church, Geogiaville, Rhode Island about 103.8 feet to said Farnum Pike; thence southwesterly bounding northeasterly on said Farnum Pike about 113 feet to Wolf Hill Road at the point and place of beginning.

5. Based on the information set forth in this Affidavit, I believe that the bank account and real properties listed above is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C).

## II. <u>OVERVIEW OF OPERATION OF THE HEALTH CARE PROGRAMS</u>

### A. <u>MEDICARE</u>

6. Medicare is a federal health insurance program for persons 65 and older, as well as persons under 65 who are blind or disabled. Medicare was established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 <u>et seq.</u> The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of Health and Human Services.

7. The Medicare program includes a voluntary supplemental insurance benefit known as "Part B," which is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Part B pays for outpatient services such as doctor's office visits, laboratory services, and infusion drugs. The Part B program requires that beneficiaries bear some of the cost of their care. In general, Medicare covers 80 percent of the reasonable charges for services and equipment. Medicare beneficiaries or their supplemental insurance carriers are responsible for the remaining 20 percent.

8. The federal government provides reimbursement for Medicare claims through CMS. CMS contracts with private insurance organizations, referred to as "Carriers" under Part B, to receive, adjudicate, and pay Medicare claims submitted by approved and participating health care providers. These Carriers are required to administer the Medicare program according to regulations established by CMS. Part B covered services must be submitted by a provider or

supplier to the appropriate regional Carrier based upon the beneficiary's state of residence. During the time frame of this investigation, CMS had contracted with two different Part B Carriers to process and pay claims in Rhode Island: Blue Cross and Blue Shield of Rhode Island ("BCBSRI") and Blue Cross and Blue Shield of Arkansas ("BCBSAK"). BCBSRI processed claims between January 2000 and January 2003. BCBSAK has processed all Part B Medicare claims from Rhode Island since February 2003.

9. In 1996, Congress enacted the Health Insurance Portability and Accountability Act ("HIPPA"), which authorized CMS to contract with entities other than Medicare Carriers and Fiscal Intermediaries to perform certain program safeguard activities. As a result, CMS created Program Safeguard Contractors (PSCs). PSCs are empowered by CMS under 42 U.S.C. §1893(b) to review the activities of providers who receive Medicare payments. In New England, the PSC authorized by CMS to perform program integrity reviews is known as the Benefit Integrity Support Center (BISC). The BISC's functions include medical policy development, prepay and post-pay medical review of claims, and data analysis.

B. **MEDICAID**

10. The Rhode Island Medical Assistance Program ("Medicaid") is jointly funded by the state and federal governments and managed by the Rhode Island Department of Human Services ("DHS"), to provide health care benefits to certain low-income individuals and families as determined by federal and state law. The federal share of the Rhode Island Medicaid program between 2000 and 2005 has ranged between 52.45% to 56.03%. DHS has subcontracted the responsibility of processing and reviewing Medicaid claims and payments to Electronic Data Services, Inc. ("EDS").

11. The State of Rhode Island has established a Surveillance and Utilization Review Subsystem ("SURS") to ensure proper and efficient administration of the Medicaid program. The SURS unit reviews provider claim patterns and histories for statistical aberration. Providers identified through this review may then be subject to more detailed claim examination, including review of medical records underlying the suspect transactions. The Medicaid claims data is electronically maintained by Rhode Island's Medicaid Management Information Systems ("MMIS") division.

C. **PRIVATE HEALTH INSURANCE COMPANIES**

12. There are a number of private health insurance companies that operate in Rhode Island, such as Blue Cross and Blue Shield of Rhode Island ("BCBSRI") and United Healthcare ("UHC"). These insurance companies pay claims for medical services submitted by registered providers on behalf of its subscribers.

**D. PROVIDER AGREEMENTS AND CLAIM SUBMISSIONS**

13. In order to bill the insurance carriers, healthcare providers and suppliers such as doctors, physical therapists, and medical supply companies, must have their own individual provider number. In order to obtain a provider number, the provider must sign a provider agreement with each carrier acknowledging that the provider: (a) is familiar with billing requirements; (b) promises not to submit false or fraudulent claims; (c) agrees to abide by the rules, regulations, policies and procedures governing reimbursement; and (d) will keep and allow access to records and information as required by each carrier. The provider agrees to provide the subscribers with those services which are medically necessary, within the scope of the physician's license, in accordance with applicable standards for patient care and appropriate utilization of inpatient, ambulatory, ancillary, and emergency services, in accordance with all applicable laws, regulation and rules of professional ethics. The enrolled providers, together with authorized agents, employees, and contractors are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable polices and procedures issues by the Carriers. Title 1862 of the Social Security Act provides that "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services – 1(A) which....are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,... which are not reasonable and necessary for the prevention of illness...."

14. In Rhode Island, group providers such as a physician's practice or a physical therapy clinic, submit claims to Medicare or Medicaid using a group provider number. Although claims are submitted under a group number, the rendering physician must be identified using his/her individual billing number. In this case, RMG submits claims to Medicare and Medicaid using provider numbers 119080024 and RM37272, respectively. Each claim submitted with RMG's provider number, also identifies the physician rendering the services. The following have been determined as Dr. Wehbe's individual provider number for each of the corresponding health insurance carriers:

(a) Medicare – 007008879;

(b) Medicaid – 9002435;

(c) Blue Cross and Blue Shield of Rhode Island – RI8875;

(d) Blue Cross Rite Care – CP00005375;

(e) Neighborhood Health Plans of Rhode Island – 000000001811; and,

(f) United Health Care – 139954.

15. Dr. Wehbe enrolled and signed provider agreements with all of the above providers, with the exception of Medicaid, before January 1, 2000. Dr. Wehbe enrolled and signed a provider agreement with Medicaid on May 1, 2001.

16. Providers submit claims to health insurance carriers on a standardized form, commonly referred to as a CMS-1500 form, or they can submit their claims electronically. In this case, RMG submits its claims to all of the Carriers electronically, by means of a computer. Those claims are then processed by the Carriers. In the case of Medicaid, payment is made to RMG through a direct deposit into RMG's bank account, as further described below. The other Carriers mail reimbursement checks to RMG's Providence Office.

## E. EVALUATION AND MANAGEMENT CODES

17. Providers who perform medical services are required to submit claims for payment using codes to describe the services rendered to patients. These codes are assigned by the American Medical Association and designated as Current Procedural Terminology ("CPT"), or procedure codes, to commonly identify medical services for billing purposes. These codes are standardized and are used for all health care insurance carriers. Each CPT code is assigned an allowable charge and published on fee schedules specific to each carrier. The CPT manual has definitive documentation guidelines that are required for each level of service code within various evaluation and management ("E/M") categories. The E/M section is divided into broad categories such as office visits, hospital visits and consultations. Most of the categories are further divided into two or more subcategories of E/M services. For example, there are two subcategories of office visits (new patient and established patient). The subcategories are further classified into levels of E/M services that are identified by specific codes. This classification is important because the nature of physician work varies by type of service, place of service, and patient's status.

18. The basic format of the levels of E/M services is the same for most categories. First, a unique code number is listed. Second, the place and/or type of service are specified. Third, the content of the service is defined. Fourth, the nature of the presenting problem(s) usually associated with a given level is described. Fifth, the time typically required to provide the service is specified. The descriptor for the levels of E/M service recognizes seven components. Of these, six are used in defining the levels of E/M services. The seven components to the code selection are: the extent of history; the extent of exam; the extent of medical decision making; counseling; coordination of care; nature of presenting problem; and amount of time spent with the patient.[1] The history, exam, and medical decision making are the key components when selecting the level of code. The next three components (counseling, coordination of care, and the nature of the presenting problem) are considered contributory factors in the majority of encounters. Although the first two of these contributory factors are important E/M services, it is not required that these services be provided at every patients encounter.

19. The CPT manual describes codes 99211 through 99215 as an "[o]ffice or other outpatient visit for the evaluation and management of an established patient." There are different levels of E/M codes depending on the complexity of the visit. A level 1 visit (code 99211) corresponds to the lowest level of service, while a level 5 visit (code 99215) represents the highest level of service. Each code level requires a certain number of the medical key components. Reimbursement amounts usually increase as the code level increases:

(a) CPT code 99215 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these key components: 1) A detailed history; 2) A detailed examination; or 3) Medical decision making of a high complexity. Usually the presenting problem(s) are of a moderate to high severity. The physician typically spends 40 minutes face-to-face with the patient."

---

1 The specific times expressed in the visit code descriptors are averages, and therefore represent a range of times, which may be higher or lower depending on actual clinical circumstances. The time considered for E/M codes for office visits is face-to-face time defined as only the time that the physician spends face-to-face with the patient and/or family. This includes the time during which the physician performs such tasks as obtaining a history, performing an examination, and counseling the patient. It does not count pre- and post-encounter time, which may be spent reviewing records and tests, arranging for further services, and communicating with other professionals.

(b) CPT code 99214 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these key components: 1) A detailed history; 2) A detailed examination; or 3) Medical decision making of a moderate complexity. Usually the presenting problem(s) are of a moderate to high severity. The physician typically spends 25 minutes face-to-face with the patient."

(c) CPT code 99213 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three key components: 1) An expanded problem focused history; 2) An expanded problem focused examination; and 3) A medical decision of low complexity. Usually, the presenting problem(s) are of low to moderate severity. They physician typically spends 15 minutes face-to-face with the patient."

(d) CPT code 99212 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three key components: 1) a problem focused history; 2) a problem focused examination; and 3) straightforward medical decision making. Usually the presenting problem(s) are self-limited or minor. The physician typically spends 10 minutes face-to-face with the patient."

(e) CPT code 99211 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically five minutes are spent performing or supervising these services.

20. The following charts display sample reimbursements amounts for 99214 and 99215 for each Carrier for the year 2004:

**Established Patient E/M Code Reimbursement Amounts 2004**

| | 99214 | 99215 |
|---|---|---|
| Medicare | $ 68.15 | $ 98.54 |
| Medicaid | $ 27.00 | $ 32.00 |
| NHPRI (MCO) | $ 65.50 | $ 95.86 |
| Blue Cross Rite Care | $43.50 / $50.00* | $ 68.63 |
| Blue Cross Private | $64.60-85.19** | $104.50 - $123.17** |
| UHC Private | $ 51.25 | $ 51.25 |

*On 10/1/2004 the reimbursement amount changed
** On 8/1/2004 the reimbursement amount changed
*** On 3/1/04 AND 8/1/04 the reimbursement amount changed

## III. THE INVESTIGATION

## A. 2002 MEDICARE AUDIT

21. I was informed that, in 2002, Medicare performed two medical reviews on Dr. Wehbe's 99215 claims. The reviews were initiated when Dr. Wehbe was identified by BCBSRI as having substantially higher billing levels than his peers (other internists in Rhode Island). Specifically, Dr. Wehbe was the highest biller of E/M code 99215, with 278 claims billed between July 1, 2001, and December 31, 2001. The next closest physician billed one hundred and fifty (150) 99215 codes during the same time period.

22. As part of this investigation, documents were obtained associated with the 2002 Medicare reviews. The following is a summary of these documents:

a. Dr. Edward Martin, MD, a physician consultant for Medicare, reviewed 32 medical records related to the claims Dr. Wehbe submitted for CPT code 99215. All 32 claims were either denied or re-coded down at least two CPT code levels, resulting in an error rate of 100%. Specifically, twenty-seven (85%) claims were down-coded three levels to 99212, two (6%) claims were down-coded two levels to 99213, and three (9%) claims were denied due to no documentation.

b. Dr. Wehbe was informed of the results of this review in a letter from RIMS dated September 24, 2002. This letter also informed Dr. Wehbe that as a result of the initial review, all of his 99215 claims were subject to a prepayment medical review until significant improvement was maintained. BCBSRI attached copies of the E/M guidelines published in the September/November 1994 and July/August 1997 Medicare memos.

c. On April 21, 2003, BCBSRI wrote a letter to Dr. Wehbe outlining the results of the prepayment review of his 99215 claims for the period September 24, 2002 through March 31, 2003. Of 30 claims reviewed, twenty-two (73%) claims were down-coded three levels to 99212, two (7%) claims were down-coded two levels to 99213, and six (20%) claims were denied because the medical records did not indicate that the services were rendered. BCBSRI enclosed a copy of the Evaluation and Management Documentation from CMS and also advised that additional information was available on the Internet at the CMS and Rhode Island Medicare websites.

d. On November 19, 2003, BCBSRI wrote a letter to Dr. Wehbe outlining the results of the prepayment review of his 99215 claims for the period April 1, 2003 through September 30, 2003. Of 32 claims reviewed, twenty-four (75%) claims were down-coded three levels to 99212, one claim (3%) was down-coded two levels to 99213 and seven (22%) claims were determined to be medically unnecessary and were denied. This letter advised Dr. Wehbe that Medicare information is available on the Internet at the CMS and Rhode Island Medicare websites and it gave an additional website for documentation guidelines for E/M services. The letter also informed Dr. Wehbe that a meeting would be set up to discuss his billing practices.

e. On January 13, 2004, Linda Hunt Morrocco, MRUR Specialist, Dr. Parker J. Staples, Carrier Medical Director, and Dr. Edward Martin, Medical Review Consultant, met with Dr. Wehbe. The group discussed Dr. Wehbe's billing and documentation practices, why his 99215 codes were being denied, and how services are properly coded and documented.

f. BCBSRI sent a letter to Dr. Wehbe dated January 14, 2004, the day following the meeting. BCBSRI enclosed clinical examples from the 2003 Current Procedural Terminology (CPT) book, a copy of the 1997 Documentation Guideline for Evaluation and Management Services, and the American Medical Association customer services telephone number to purchase a 2004 CPT book.

g. On September 30, 2004, the reviewers sent Dr. Wehbe a letter notifying him that the prepayment medical review of all 99215 claims which had started on September 24, 2002, was completed. According to the letter, Dr. Wehbe's documentation of claims billed had improved sufficiently and satisfied BCBSRI's documentation requirements. As a result, Dr. Wehbe was removed from the provider specific audit on August 30, 2004.

**B. <u>2005-2006 EDS REVIEW</u>**

23. Beginning in October 2005 and continuing through 2006, Vivian Cardoza ("Cardoza"), a Registered Nurse and the lead Surveillance and Utilization Review Subsystem ("SURS") Reviewer with EDS (Electronic Data Systems, an auditor for Medicaid), reviewed medical records related to a random sample of 215 claims with E/M codes of 99214 and 99215 E/M submitted by Dr. Wehbe, for dates of service between April 1, 2004 and June 30, 2005. According to Cardoza's report, 85% of the claims for office visits submitted by Dr. Wehbe during this time period were for codes 99214 and 99215.

24. Cardoza's audit report stated in part: "The documentation submitted for review was not complete in several areas. No physician orders were noted but some results of testing were included. In several instances, the second page of a two page report was missing. Numerous reports of the results for diagnostic procedures and all the administration records for Remicade infusions were also missing. . . . Lab procedures were ordered excessively and many did not appear to be medically necessary because lab procedures were repeated when previous results were normal and tests that should have been drawn while the patient was fasting, were not. . . . It does appear that Dr. Tarek Wehbe or someone signing a "T" or "TW" wrote most of the office records attributed to Dr. Wehbe."

25. Cardoza determined that out of the 215 E/M services reviewed, 24 services did not have any documentation supporting the service, 113 services were up-coded one level, 58 services were up-coded two levels, three services were up-coded three levels, and fifteen services were appropriately billed. The total error rate for this review was 93%.

26. Cardoza's review also addressed Dr. Wehbe's billing of E/M codes with a modifier "25[1]" when there was no evidence in the medical records of a second visit being performed or documentation indicating that a separate identifiable services were performed. The medical record often noted that the patient had no complaints.

27. Cardoza's audit report stated in part: "The documentation submitted for review was not complete in several areas. No physician orders were noted but some results of testing were included. In several instances, the second page of a two page report was missing. Numerous reports of the results for diagnostic procedures and all the administration records for Remicade infusions were also missing. . . . Lab procedures were ordered excessively and many did not appear to be medically necessary because lab procedures were repeated when previous results were normal and tests that should have been drawn while the patient was fasting, were not. . . . It does appear that Dr. Tarek Wehbe or someone signing a "T" or "TW" wrote most of the office records attributed to Dr. Wehbe."

28. Dr. Raymond Maxim, a Consulting Medical Director for the DHS, performed an independent review of the same medical records that were reviewed by Cardoza. Dr. Maxim

---

[1] Modifier 25 is used to identify a significant, separately identifiable evaluation and management service by the same physician on the same day of the procedure or other service: the physician has to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's condition required a significant, separately identifiable E/M services above and beyond the other services provided or beyond the usual preoperative and postoperative care associated with the procedure that was performed.

reviewed 279 E/M services and the ancillary services performed during the E/M visit.[2] In a letter dated June 8, 2006, Dr. Maxim outlined the results of his review. Dr. Maxim had multiple areas of concern. Dr. Maxim found that of the 279 records he reviewed, the vast majority (99.2%) of the physician notes failed to meet the documentation necessary to support the level of E/M codes billed. Dr. Maxim found that 35% should be down-coded one level, 49.8% should be down-coded two levels, and .7% should be down-coded three levels. Dr. Maxim also noted that the frequency of the visits for follow-up exams were not medically necessary for the documented condition where some patients had as many as 16 visits in a 14-month period. Dr. Maxim also noted that there was no documentation of physician orders for laboratory tests for any of the lab results provided in the medical record. There was a pattern of excessive lab use and unbundling[3] of lab services with the possible intent to maximize reimbursement.

29. On December 12, 2006, this Court (Magistrate Judge Lincoln D. Almond) authorized a search warrant of RMG's medical offices at 790 North Main Street, Providence, Rhode Island and 1630 Mineral Spring Avenue, North Providence, Rhode Island. That search warrant was obtained, in part, based on the E/M review conducted by Vivian Cardoza, as well as additional information provided to the Court including Dr. Wehbe's Remicade infusion practice (see below). That search warrant authorized the United States to seize 460 patient medical files. This list was determined through a statistically valid random sample ("SVRS"), developed by CMS statisticians. I have been informed by agents at the Department of Health and Human Services that SVRS is an accepted method to investigate fraudulent billing patterns by a medical practice. Since large medical practices, such as RMG, have thousands of patients, it is impractical to review each and every patient file. Accordingly, a random, statistically valid, sample of files is reviewed. In this case, in addition to those patient records picked at random, the United States also seized the medical records for all patients receiving Remicade infusions by Dr. Wehbe.

30. Following execution of the search warrant and the seizure of the 460 patient files, these files were turned over to Vivian Cardoza to conduct an expanded review of claims submitted between April 1, 2004 and June 30, 2005. This time, Cardoza's review was not limited to

---

[2] Dr. Maxim reviewed 64 additional services. He reviewed all services contained in the medical records he received, while Cardoza only reviewed the dates of service between April 1, 2004 and June 30, 2005.

[3] Certain laboratory services are bundled into one CPT code and are reimbursed at a lower rate due to the simplicity at running the certain tests at the same time. Unbundling of laboratory services occurs when the provider bills using each individual tests CPT code instead of the one CPT which represents all tests within the category.

Medicaid, but included other Carriers such as UHC (private and RiteCare), BCBS (private and RiteCare), NHPRI, and Medicare.

31. First, Cardoza reviewed the randomly picked sample claims that were billed to Medicaid Fee For Service (FFS), and three RiteCare Providers (UHC, BC, and NHPRI) , where Dr. Wehbe was listed as the rendering physician. Cardoza determined that out of the 234 office visit claims reviewed, 33 claims had no documentation, one claim was a duplicate, and one was not a visit. Of the 199 remaining office visits for which a record was present, 178 were upcoded at least 1 level, which is 89% of the time. In general, she found the documentation to be extremely poor with lack of documentation of findings from diagnostics procedures. The pattern of ordering unnecessary lab procedures, drawing non-fasting samples for cholesterol, and billing the "25" modifier unjustifiably also continued. The following charts summarize Cardoza's findings:

| DESCRIPTION | | FFS | BCBS | UHC | NHPRI | TOTALS | PERCENT |
|---|---|---|---|---|---|---|---|
| NO DOCUMENTN. | | 5 | 2 | 2 | 7 | 16 | 7% |
| APPROPRIATE | | 0 | 5 | 8 | 8 | 21 | 9% |
| UPCODED 1 LEVEL | | 8 | 3 | 13 | 15 | 39 | 17% |
| UPCODED 2 LEVELS | | 16 | 28 | 17 | 40 | 101 | 43% |
| UPCODED 3 LEVELS | | 16 | 8 | 4 | 6 | 34 | 15% |
| UPCODED 4 LEVELS | | 3 | 1 | 0 | 0 | 4 | 2% |
| DUPLICATE | | | | | 1 | 1 | |
| NOT A VISIT | | | | | 1 | 1 | |
| NO RECORD IN BOX | | 2 | 3 | 6 | 6 | 17 | 7% |
| TOTALS | | 50 | 50 | 50 | 84 | 234 | 100% |

None of the appropriately coded claims were submitted by Dr. Wehbe himself. Rather, they were submitted by his nurse practitioner, Kathy Rubiero, or another covering physician. Based on this error rate and the billing for undocumented claims, Cardoza recommended the recoupment of $5,428.26 for the reviewed visits.

32. Cardoza also conducted a review of a 256 claims submitted to Medicare, Blue Cross Blue Shield, and United Health Care during the same time period where Dr. Wehbe was the attending physician. The following chart summarizes Cardoza's findings:

| [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|---|
| APPROPRIATE | | 3 | 7 | 9 | 19 | 8.00% |
| NO DOCUMENTATN | | 6 | 14 | 19 | 39 | 15% |
| UPCODED 1 LEVEL | | 54 | 56 | 37 | 147 | 57% |
| UPCODED 2 LEVELS | | 12 | 22 | 11 | 45 | 18% |
| UPCODED 3 LEVELS | | 1 | 1 | 4 | 6 | 2% |
| [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

Of the appropriate claims, only one was attributed to Dr. Wehbe. The other appropriate claims were submitted by Kathy Rubiero, his nurse practitioner, or another covering physician. Based on this data set, Cardoza recommended recoupment of $2,044.80 for Medicare, $3,441.70 for BCBS, and $1,131.40 for UHC. The same pattern of lack of documentation described in paragraphs 25-27 and 31 applies to these claims as well. Cardoza noted that the medical record often noted that the patient had no complaints. Furthermore, many records contained the same generic diagnosis and rarely contained a treatment plan.

C. **<u>"IMPOSSIBLE DAY" ANALYSIS</u>**

33. During the course of this investigation, investigators obtained billing and claims data from Medicare, Medicaid, BCBS (private and RiteCare), UHC (private and RiteCare), and NHPRI ("the carriers") for the period of January 1, 2002 to December 31, 2006. In analyzing the carrier data, it appeared that over 75% of Dr. Wehbe's billings were for high-level (99214 and 99215 E/M codes. In addition, not only was Dr. Wehbe's pattern of E/M codes billed inconsistent with most physicians of his specialty, the number of E/M visits Dr. Wehbe billed per day was impossible for any physician to perform. Dr. Wehbe's average billing day consisted of 38 E/M visits per day. I was informed by Health and Human Services Office of Inspector General Special Agent Lisa McCarthy, that in 47% of the days in the review period, Dr. Wehbe billed for more than 25 visits a day.[4] The majority of the codes billed for those days were high level E/M codes which signify visits typically lasting 25 minutes. Obviously this indicated that Dr. Wehbe was either inflating the number of patient visits, exaggerating the complexity of those visits, or both.

34. During the time period under investigation, Dr. Wehbe had days where he billed 50 to 70 visits in one day. For example, Dr. Wehbe billed the Carriers for 78 E/M office visits for

---

[4] Only office and outpatient visits and consultation E/M codes were used for this analysis. There are other E/M codes for hospital inpatient services, which were billed by Dr. Wehbe, but were not used for the E/M analysis.

December 27, 2002. The approximate time that would have been necessary for Dr. Wehbe to perform these visits is about 33.6 hours.[5]

35. On September 10, 2004, Dr. Wehbe billed the Carriers for 72 E/M office visits. The approximate time required for Dr. Wehbe to perform the visits he billed for September 10, 2004 would have been 28 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 69 E/M office visits for September 10, 2004. This is an average of approximately 11 patients seen by each of the six physicians on September 10, 2004.

36. Dr. Wehbe billed the Carriers for 68 E/M office visits for May 14, 2004. The approximate time required for Dr. Wehbe to perform the visits he billed for May 14, 2004 would have been 27 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 51 E/M office visits for May 14, 2004. This is an average of approximately 8 patients seen by each of the six physicians on May 14, 2004.

37. Dr. Wehbe billed the Carriers for 63 E/M office visits for January 7, 2005. The approximate time required for Dr. Wehbe to perform the visits he billed for January 7, 2005 would have totaled 25.4 hours. Comparatively, five of the other RMG physicians billed the Carriers for a total of 40 E/M office visits for January 7, 2005. This is an average of approximately 8 patients seen by each of the five physicians on January 7, 2005.

38. Dr. Wehbe billed the Carriers for 55 E/M office visits for February 4, 2005. The approximate time required for Dr. Wehbe to perform the visits he billed for February 4, 2005 would have been 23.6 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 43 E/M office visits for February 4, 2005. This is an average of approximately seven patients seen by each of the six physicians on February 4, 2005.

39. Dr. Wehbe billed the Carriers for 87 visits for March 7, 2006. The approximate time required for Dr. Wehbe to perform the visits he billed for would have been approximately 28.42 hours. Comparatively, the other physicians at his office billed for an average of twelve patients per physician. 76 of Dr. Wehbe's E/M claims were coded as 99214. This investigation obtained all the encounter forms and patient files associated with Dr. Wehbe's billings for 3/7/2006. The encounter forms (the form that is used to code the services rendered and is the basis of the claim

---

[5] I have determined the average time by reviewing each procedure code billed and taking the typical time for such a code from the CPT manual and then multiplying said code by the number of visits utilizing that code. Thus, if the typical time for code 99214 is 25 minutes and Dr. Wehbe billed three such codes on a particular day, Agent McCarthy would multiply 25 minutes times three. I was informed by Special Agent McCarthy that she would then add up all the other codes billed in the same manner.

submitted to the Carriers) and progress notes (the physician's summary of the patient's visit, examination, diagnosis, and treatment plan that is placed in the patient's file) were sent for review by Vivian Cardoza and Dr. Maxim to determine the propriety of the E/M billing for that day. The following summarizes Cardoza's review:

a. Of 87 claims reviewed, 15 were excluded for lack of any documentation, 4 were for patients who were seen for infusion therapy only but for which there was no documented separate visit (although one had been billed for), one was excluded as the record contained no history, physical, diagnosis, or treatment plan, two claims were filed under names other than the person examined, one visit was not reviewed as the wrong visit classification was utilized.

b. Of the remaining 63 office visits, only 2 were coded appropriately.

c. 26 claims were upcoded one level (41%)

d. 31 claims were upcoded two levels (49%)

e. 4 claims were upcoded 3 levels (6.3%)

As with the previous review, Cardoza noted that documentation was poor and seldom described the basis of diagnosis, the treatment provided, or documented a reason for the visit. Several office visits were for "no complaint" and yet were billed at high E/M codes. A review of the time indicated on the claim forms showed that Dr. Wehbe documented as many as four patients as being treated in a five-minute period. Of those, three were billed as 99214 and one was billed as 99213.

38. For the day of 3/7/06, Dr. Wehbe was paid approximately $3,579.04 by the carriers as payment for E/M codes (office visits). Based on Cardoza's review, 96% of this amount constituted an overpayment. It should be noted that Dr. Wehbe was also paid $8,167.98 for infusion therapies he provided that same day, and over $10,000 for various other labs and procedures for which he submitted claims.

**D. <u>TOTAL OVERPAYMENT CALCULATIONS</u>**

39. During the course of this investigation, investigators obtained claims data from the carriers for E/M codes 99214 and 99215 (and associated modifiers) for the period of January 1, 2002 to December 31, 2006. Based on the review conducted by Vivian Cardoza, an overpayment error rate was established for each carrier, and an overpayment amount was calculated. This analysis is summarized in the following chart:

| | | | | | | |
|---|---|---|---|---|---|---|
| BCBS | $862,555 | $95,277 | 14,428 | $957,832 | 52.36% | $501,521 |
| BC RtCare | $39,735 | $8,228.71 | 965 | $47,96448% | | $23,056 |
| Medicaid | 147,420 | $54,614 | 7383 | $202,034 | 39% | $79,621 |
| Medicare | $506,134.31 | $39,589.39 | 8366 | $545,723.70 | 36.14% | $197,224.55 |
| NHPRI | $314,462 | $54,380 | 5,432 | $368,842 | 51.31% | $189,252.65 |
| UHC Pvt | $197,051 | $16,481 | 4010 | $213,532 | 43.18% | $92,203 |
| UHC Cosmo | $129,022 | $18,419 | 3185 | $147,442 | 43.18% | $ 63,665.33 |
| UHC Rtcare | $79,377 | $13,966 | 2279 | $93,342 | 36.73% | $34,285 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $1,186,829 |

40. Accordingly, there is probable cause and a reasonable basis to believe that from January 1, 2002 to December 31, 2006, Dr. Wehbe collected over $1.18 million in funds to which he was not entitled as a result of false and fraudulent billings he submitted to the various carriers listed above. As detailed above, repeated audits of Dr. Wehbe's billing practices revealed a pattern of unsupported billings. Based on the volume of patients Dr. Wehbe regularly claimed he examined on any given day, it was virtually impossible for him to substantiate the complex evaluation and management codes which he billed, as there are simply not enough hours in the day during which to conduct those examinations.

## IV. <u>FRAUDULENT BILLINGS OF INFUSION THERAPIES</u>

### A. <u>REMICADE</u>

(1) *Information from the Manufacturer*

41. Remicade (also known as Infliximab, the active ingredient in Remicade) is manufactured by Centocor. Remicade is an advanced biologic agent that has been shown to have substantial benefits in patients with a number of inflammatory disorders involving the immune system. Remicade targets specific proteins in the body's immune system to help control the development of inflammation, significantly reducing painful symptoms in diseases such as ulcerative colitis, Crohn's disease, ankylosing spondylitis, psoriatic arthritis, and rheumatoid arthritis. While Remicade does not cure the diseases, it might reduce inflammation in the body and help the patient feel better. Remicade can also cause serious side effects and can reduce the body's ability to fight infections.

42. According to the manufacturer's website, Remicade is given by IV infusion, a process that usually takes about two hours. A healthcare professional administers the treatment in a supervised environment, which is either a physician's office or a treatment center. Remicade dosing is dependent upon the patients' diagnosis and body weight. The recommended dosing for patients with Rheumatoid Arthritis is three milligrams of Remicade for every kilogram of body weight. Patients receive the first dose followed by additional doses at two and six weeks after the first dose, then every eight weeks thereafter. For patients who have an incomplete response, consideration may be given to adjusting the dose up to 10 milligrams per kilogram or treating every four weeks bearing in mind that risk of serious infections is increased at higher doses.

43. Remicade must be administered (after it is reconstituted with sterile water and Sodium Chloride) over a period of not less than two hours and must use an infusion set with an in-line, sterile, non-pyrogenic, low-protein-binding filter (pore size of 1.2 micrometers or less).

44. According to Centocor's Medication Guide for Remicade, serious and sometimes fatal side effects have been reported in patients taking Remicade. These include: serious infection, such as tuberculosis or hepatitis B; cancer; heart failure; liver injury; blood problems; nervous system disorders; allergic reactions; and lupus-like syndrome. Physicians should perform a complete medical history and physical prior to treating patients with Remicade. Patients who have or are prone to the above mentioned conditions will need to be examined by the physician to determine whether Remicade treatment could jeapordize the patient's health. Centorcor's medication guide advises that physicians should test patients for a latent tuberculosis infection and hepatitis B virus prior to and during Remicade treatments. Patients who have been treated for rheumatoid arthritis, Chron's disease, ankylosing spondylitis, psoriatic arthritis for a long time may be more likely to develop lymphoma or other cancers. Patients with congestive heart failure should be monitored closely while taking Remicade; congestive heart failure may get worse.

(2) *Information from the American College of Rheumatology*

45. Biologic agents have been approved by the FDA to treat moderate to severe rheumatoid arthritis that has not responded to an adequate trial of one or more disease modifying antirheumatic drugs ("DMARDs"), such as methotrexate, leflunomide, hydroxychloroquine, sulfasalazine. Because of their expense and side effects, most people with mild to moderate rheumatoid arthritis are treated with methotrexate before a biologic agent is used unless they are

unable to take methotrexate because of side effects or other conditions. Biologic agents such as Remicade may be used alone, but are often given in conjunction with other DMARDs to increase the benefit and limit potential side effects.

46. Remicade must be given by an injection under the skin or by intravenous (IV) infusion. Remicade must be stored in a refrigerator and warmed to room temperature prior to use. Remicade infusions are either done through an IV line in the doctor's office or specialized infusion centers. These treatments usually take two to three hours.

47. Remicade usually works quickly to relieve the symptoms and swelling associated with rheumatoid arthritis. Although the studies show that most patients will improve within 4- 6 weeks of treatment, most patients will notice marked improvement after the first or second injection.

48. The most significant side effect of Remicade is an increase of the risk of all types of infections, including tuberculosis (TB). Accordingly, there is a "black box" warning for Remicade which directs physicians to test patients for TB before starting Remicade infusion therapy. Remicade treatment should be stopped if the patient has an active infection or is taking an antibiotic. Remicade can cause allergic reactions. There are rare neurologic complications from Remicade and people with multiple sclerosis should not use it. People with significant congestive heart failure should not take Remicade.

49. The CPT code for Remicade is J1745, "Injection, infiximab, 10mg." Each carrier has its own coverage policies and reimbursement amounts for Remicade. The following chart illustrates Dr. Whebe's reimbursement amounts by all the Carriers for the time period of January 1, 2002 to December 31, 2006.

| [redacted] | | | | | | | |
|---|---|---|---|---|---|---|---|
| | $715,976 | $ 823,938.00 | $ 138,936.00 | $ 220,474.00 | $ 1,070.42 | $ 146,980.00 | $ 2,047,376.00 |
| | 12346.00 | 18512.00 | 2401.00 | 3490.00 | 60 | 2430.00 | 3923.00 |

**B. <u>MEDICAID REVIEWS OF DR. WEHBE'S REMICADE INFUSIONS</u>**

50. As mentioned earlier, Cardoza reviewed the Remicade infusion records for the patients whose records were initially in the E/M review for Dr. Wehbe. Cardoza reported that all infusion services were lacking documentation. According to Cardoza, she has reviewed

Remicade infusion records written by other physicians, and she typically found documentation containing the following notes: 1) assessment of patient's vital signs before the infusion, as well as periodically during the infusion (anywhere from every 15 to 30 minutes); 2) patient's weight; 3) dose given; 4) lot number and expiration date from the vial(s) of Remicade infused; 5) name of person administering the Remicade; 6) site of administration; 7) size of needled used for infusion; 8) infusion rate; 9) time infusion started and ended; and 10) what substance was used to reconstitute the Remicade. By contrast, Dr. Wehbe's records contained only a notation of "Remicade" and the dose given. There was no separate infusion record. Cardoza also found that often the patient's weight was not recorded so there was no way to determine what the appropriate dose should have been. In two-thirds of the cases the infusions took place every three weeks or less – a much greater frequency than the recommended dosing protocol.

51. Cardoza reported that, "the doses and frequency of the administration of Remicade that was billed was suspect…" According to Cardoza, who relied on the May 2005 issue of "Drug Facts and Comparisons", the recommended dosage for Remicade is 3mg/kg given as an intravenous (IV) infusion followed with additional similar doses at 2 and 6 weeks after the first infusion, then every 8 weeks thereafter. The publication recommends administering Remicade in combination with methortexate. For patients who have an incomplete response, the guidelines provide that the dose may be adjusted to 10/mg per kg or treatment as often as every 4 weeks. Cardoza found that Dr. Wehbe's records frequently lacked any record of the patient's weight, so it was not apparent how the dosage was calculated. One recipient was billed for 22 sessions for IV infusions of Remicade for dosages ranging from 300 mg to 700 mg every 2-3 weeks. No methotrexate was billed. The amount and frequency of the medication billed was well out of the recommended ranges

52. In addition to the Remicade services that were reviewed as part of the E/M code review, Cardoza performed data review for 29 patients, as well as a medical record review for one patient (WW), who received Remicade between January 1, 2003 and June 1, 2006. Cardoza determined through billing data queries that out of 29 patients, only five were documented as having been tested for tuberculosis ("TB"), and none had received chest x-rays (that were billed by Dr. Wehbe) prior to the initiation of Remicade therapy or during the period of Remicade administration.

53. The United States Attorney's Office also engaged Dr. Harold M. Horwitz, M.D., a Board Certified Rheumatologist, to review four patient records for Dr. Wehbe's Remicade patients. I was informed that Dr. Horwitz found, based on his review, that the accepted dosing protocols were not followed. In the charts reviewed by Dr. Horwitz, none of the patients had been tested for latent tuberculosis. Dr. Horwitz submitted a letter to the United States Attorney's Office in which he summarized his findings as follows: "In reviewing these records in general the documentation of the degree and nature of the complaints is poor. There is almost no physical exam or even imaging documentation of rheumatoid arthritis in these cases. . . . In summary, the rheumatologic care with particular regards to the use of Remicade in the four patients that I reviewed is significantly outside the standard of good care." Dr. Horwitz also stated that, "many of the doses that these patients received exceeded the 10 mg/kg maximum. Likewise, they also received the drug much too frequently. There was hardly any indication for every four-week treatment. There is no indication for every 2 week treatment. The doses that were used in many of the patients varied for no documented reason regarding the state of their disease."

54. In late December 2006, the Rhode Island Board of Medicine instructed Dr. Wehbe to cease and desist from any Remicade infusion of his patients. Agents of the HHS and the MFCU have obtained infusion billing records for Dr. Wehbe's Remicade patients for 2007. It appears that only five patients received any Remicade infusions in 2007, and none of those five received more than three infusions in 2007. Further, the doses documented for those five patients was significantly lower than the doses generally administered by Dr. Wehbe.

**C. <u>SEARCH WARRANT AND PATIENT INTERVIEWS</u>**

55. As mentioned above, on December 16, 2006, a court-authorized search warrant was executed at the medical offices of RMG in Providence and North Providence. As a result, a large number of patient files were seized, including all patient files for Dr. Wehbe's Remicade patients. In addition, all encounter forms were seized for the relevant time period. A review of those patient files revealed that on those dates where a Remicade infusion took place, the progress note indicated "Remicade" and at times a dose. These forms were almost always initialed by Dr. Wehbe.

56. Following the execution of the search warrant, agents involved in this investigation interviewed Dr. Wehbe, his medical associates, and his office employees. All of these individuals, including Dr. Wehbe, stated that Dr. Wehbe was solely responsible for

administration of Remicade at RMG. No other physician or nurse at the practice was involved in the administration of this infusion.

57. I have also been informed that a number of Dr. Wehbe's Remicade patients have been interviewed in connection with this investigation. All the patients interviewed stated that Dr. Wehbe determined the dose and frequency of administration of Remicade. They all stated that Dr. Wehbe was responsible for setting up the infusion and for ending it. Most of the patients stated that they were not monitored by Dr. Wehbe or the nursing staff while the infusion was underway. Many of the patients interviewed stated that the average infusion time was approximately 45 minutes to one hour - - far less than the two-hour recommended infusion time. Most of the patients denied being tested for tuberculosis.

58. I was informed by Medicaid Fraud Control Unit Investigator Thomas Bouchard that, on April 17, 2007, he interviewed Patient AS. Patient AS's medical chart and billing records show that AS has been receiving Remicade treatment from Dr. Wehbe from 2002 until 2005. While her dosages in 2002-2003 were 30 units every two to four weeks, in 2004 they increased from 40 to 60 units every two to four weeks, and in 2005, AS received 60-80 units of Remicade every two to four weeks. AS is 82 years old and weighs approximately 125 lbs. Based on her weight, it appears that between January 1, 2005 and April 9, 2005, AS received at least twice as much Remicade as the recommended dose, had the customary dosing schedule been followed. AS stated that Dr. Wehbe always hooked her up to the Remicade intravenous injection. AS stated that the total infusion time was approximately 30 minutes. AS stated that Dr. Wehbe did not monitor her while she was being infused. AS did not recall being tested for TB. AS stated that in 2006, Dr. Wehbe stopped infusing her with Remicade without a reason.

59. I was informed by Investigator Bouchard that, on June 5, 2005, he interviewed Patient WW. Claims data shows that WW received Remicade treatment from Dr. Wehbe from February to April 2005. Infusions took place approximately every two weeks. Patient WW told Investigator Bouchard that he was not tested by Dr. Wehbe for tuberculosis prior to receiving Remicade infusions. WW was hospitalized four times between May 2, 2005 and December 8, 2005, at which time he was diagnosed with TB. Inpatient medical records were requested to understand WW's history and disease progression, as the medical records from Dr. Wehbe contained very little documentation of WW's history or treatment. Inpatient records showed that WW had a long history of TB. Dr. Wehbe's records for WW lacked any documentation of TB.

The records also failed to substantiate the diagnosis of rheumatoid arthritis and the need of Remicade treatment. WW stated that Dr. Wehbe always administered the infusion and that the average infusion time was 45 minutes to one hour.

60. I was informed by Investigator Tom Bouchard that he interviewed patient CS on April 11, 2007. Claims data indicates that Patient CS received Remicade treatment from April 2005 until June 2006. She received an infusion approximately every two weeks and was infused with 50 units consistently until March 2006 when her infusion dose dropped to 30 and then 20. CS stated that she had not been tested for TB prior to starting Remicade treatment. CS stated that Dr. Wehbe hooked her up to the infusion and that the infusion time was 45 minutes to one hour. CS stated that she was not monitored during the infusion. In 2006, CS stated that Dr. Wehbe informed her that he would no longer infuse her with Remicade. He did not refer her to another physician to receive Remicade treatment.

61. I was informed by Investigator Tom Bouchard that he interviewed Patient JG on November 26, 2007 regarding her Remicade treatment by Dr. Wehbe. Claims data shows that JG received Remicade infusions approximately every two weeks from April 2004 to July 2006. JG's initial doses were 30 – 40 units. In August 2004, her dose was increased to 60 units, and from January 2005 to January 2006 she regularly received a dose of 70 units and several doses of 80 units. JG stated to Investigator Bouchard that infusion time lasted 45 minutes to one hour. JG stated that Dr. Wehbe hooked her up to the infusion and that the infusion consisted of only one "small bag." JG indicated to Investigator Bouchard that she did not feel that the Remicade treatment was helping her and that she asked Dr. Wehbe to stop the treatment.

## D. <u>IN-AND-OUT ANALYSIS</u>

63. In connection with this investigation, I reviewed Dr. Wehbe's and RMG's bank records. Through this review, it was determined that Dr. Wehbe's and RMG's suppliers of Remicade were McKesson Corporation, Florida Infusion Inc., and OTN (hereafter "the suppliers"). I have been informed by agents working on this investigation that these suppliers have been subpoenaed for all invoices documenting delivery of Remicade to RMG. I was informed by Medicare Senior Analyst Bette Ortisi that she has reviewed these invoices and added up the units of Remicade and other infusion drugs purchased by Dr. Wehbe from his suppliers. Based on these invoices, Ortisi determined that from November 2001 until December of 2006, a total of 22,890 units of Remicade were delivered to RMG. One unit of Remicade is equivalent to 10 mg.

64. As set forth above, agents involved in this investigation obtained claims data from the Carriers who reimbursed RMG for Remicade. Ortisi also reviewed claims submitted by Dr. Wehbe to the Carriers from January 1, 2002 to December 21, 2006. Based on her final claims review, Ortisi determined that Dr. Wehbe billed the carriers for 39,239 units of Remicade. That is 16,349 more units than Dr. Wehbe had in his inventory. Attached to this Affidavit as **Attachment A** is a chart that compares Remicade Units purchased to Remicade Units billed from 2002 to 2006. As apparent from the face of the chart, in each of those years, Dr. Wehbe did not have sufficient inventory of Remicade to support his volume of billing to the insurers. Taken in conjunction with what appears to be, based on the Medicaid review and Dr. Horwitz's review, grossly inflated dose amounts and overly frequent infusions of patients, as well as the short duration of the infusion reported by patients who were interviewed, there is probable cause and a reasonable basis to believe that Dr. Wehbe submitted claims for higher doses of Remicade than he actually administered.

65. I have also been informed by Ortisi that, based on her review of final claims for Remicade submitted to the Carriers for the time period of January 2002 to December 2006, she determined that the Carriers reimbursed Dr. Wehbe $2,047,376.25 for Remicade infusions. See **Attachment B** to this Affidavit. Based on the fact that 16,349 units of Remicade could not be accounted for in Dr. Wehbe's inventory, Ortisi determined that there was an overpayment of $853,043.00. See **Attachment C** to this Affidavit.

66. In the course of reviewing invoices subpoenaed from Dr. Wehbe's medical suppliers and claims submitted by Dr. Wehbe to the Carriers for other infusion drugs, it quickly became apparent to agents and investigators involved in this investigation, including Medicare Analyst Ortisi that there was a consistent disparity between the units of drugs purchased by Dr. Wehbe and the units he billed the Carriers. Thus, I was informed by Ortisi that, as illustrated in **Attachment A** to this Affidavit, Dr. Wehbe did not have sufficient inventory of chemotherapy drugs such as Paclitaxel, Gemzar, Paraplatin, Leucovorin, and Eloxatin to support the number of units he billed the Carriers for such drugs. In addition, there were significant discrepancies with drugs such as Epoetin, Immune Globulin, and Zofran. **Attachment B** sets forth the carrier reimbursement for each of these drugs for the years 2002-2006.

67. Based on the comparison of Dr. Wehbe's inventory of infusion drugs to claims he submitted to the Carriers for those drugs, it was determined that Dr. Wehbe was overpaid $1,815,034 by the Carriers. **Attachment C** to this Affidavit illustrates the overpayment analysis.

## E. DR. WEHBE ENGAGED IN FRAUD

68. Based upon the above, there is probable cause and a reasonable basis to believe that a significant portion of the payments made to Dr. Wehbe as reimbursement for infusion of Remicade, chemotherapy drugs, and other infusion drugs were based on fraudulent claim submissions by Dr. Wehbe. As set forth above, Dr. Wehbe's claims could not be supported by his inventory of infusion drugs. In addition, patients interviewed consistently informed agents and investigators that they were only infused for 45 minutes to one hour – half the recommended infusion times. Reviews by Medicaid Analyst Vivian Cardoza and a board certified rheumatologist Dr. Horwitz also suggest that Dr. Wehbe's administration was poorly documented and that, if taken at face value, Dr. Wehbe's dosing regimen fell far outside the standard infusion protocols for Remicade. Thus, there is probable cause and a reasonable basis to believe that Dr. Wehbe did not in fact administer the recorded doses of Remicade to his patients, but fraudulently inflated the billing in order to maximize reimbursement by the Carriers.

69. Similarly, as set forth above, Dr. Wehbe's practice of billing for 99214 and 99215 E/M codes appears to be wholly unsupported by his medical records, and impossible in light of the volume of patients he reportedly examined on any given day. As set forth above, audits conducted by the Carriers, based on peer reviews and patient based reviews, demonstrate that Dr. Wehbe consistently billed for services that were not medically necessary, upcoded claims, and billed for claims lacking any supporting documentation. Such fraudulent billing, if it occurs over a lengthy period of time, could result in millions of dollars in overpayment by the Carriers.

## V. DEFENDANT PROPERTIES

70. In connection with this investigation, I analyzed the bank accounts of Dr. Wehbe and RMG. I reviewed records from Citizens Bank and determined that account number 1103[redacted] belongs to Renaissance Medical Group ("the RMG account"). I reviewed monthly account statements, wire transfers, and other documents. Based on this review, I determined that Dr. Wehbe signed a number of RMG checks as an agent of RMG. I also determined, based on my review of records, that Dr. Wehbe routinely withdrew large sums of money from this RMG

account (totaling in the hundreds of thousands of dollars) and deposits these withdrawals in his personal accounts. At times, large sums of money are cashed or have not been able to be traced.

71. As part of this analysis, I have identified those payments made by the Carriers to RMG in 2004, 2005, and 2006. As set forth in the Section III, D, ¶¶ 39-40 above, from January 1, 2002 to December 31, 2006, there was an overpayment of $1,180,829 by the Carriers for Dr. Wehbe's billing of E/M codes. As set forth in Section IV, D, ¶¶ 65-67, from January 1, 2002 to December 31, 2006, there was an overpayment of $1,815,034 by the Carriers for billing of infusion drugs.

72. My review and analysis of financial documents shows that in 2004, the Rhode Island Assistance Program (Medicaid) deposited at least a total of $1,416,453.35 (Centers for Medicare/Medicaid $497,496.76 + Neighborhood Health Plan of RI $918,956.59) into the RMG account. During 2005, the Rhode Island Assistance Program (Medicaid) deposited at least a total of $2,157,754.42 (Eds Federal Corp RI MEDICAID $918,518.87 + Neighborhood Health Plan of RI $1,239,235.55) and in 2006 the Rhode Island Assistance Program (Medicaid) deposited at least a total of $1,777,328.14 (Eds Federal Corp. RI MEDICAID $681,825.04+ Neighborhood Health Plan of RI $1,062.503.10) into the RMG account. For the reasons set forth above, I believe that many of these funds were deposited into the RMG account as a result of false claims submitted to Medicaid by RMG and Dr. Wehbe.

73. The RMG account is the primary business account for RMG. This account is used to promote the specified unlawful activity of healthcare fraud, 18 U.S.C. §§ 1347, 1956(a)(1)(A)(i) & (c)(7)(F), in that it is used to pay rent for the medical offices of RMG, as well as pay RMG's pharmaceutical suppliers. Based on my review of bank records, from 2004 to 2006, RMG paid in excess of $585,000 in rent to Atlantis Management. Also, based on my review of bank records, in 2004, RMG paid Florida Infusion in excess of $430,000 and McKesson General Corporation in excess of $300,000; in 2005 RMG paid Caligor in excess of $540,000 and OTN in excess of $400,000; and in 2006, RMG paid Caligor in excess of $450,000 and OTN in excess of $440,000. Florida Infusion, McKesson General Corporation, Califor, and OTN are all pharmaceutical product suppliers.

75. My review of the account activity for RMG account number 1103[redacted] for 2004, 2005 and 2006 also revealed numerous checks issued by Dr. Wehbe payable to himself, "Tarek Wehbe," out of this checking account and deposited in various other accounts controlled by Dr. Wehbe. Based on my review of bank records, these accounts include: Citizens Bank account

numbers 45-980[redacted], 15649[redacted], and 994-984-4. As set forth above, Wehbe also pays Atlantis Management, a corporation of which he holds 99% based, out of the RMG account. Below are the check transactions I have uncovered to date. Additional transactions are set forth in greater detail below and are based on my review of financial records.

| | Ck # | Amount | Payee | Deposit Date | Acct. Deposited | Account / Name | Type of Account |
|---|---|---|---|---|---|---|---|
| 4/2004 | can not read | $ 400,000.00 | Dr. Tarek Wehbe | 1/20/2004 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 6/2004 | 3338 | $ 1,000,000.00 | Tarek Wehbe | 3/08/2004 | Cashed | | |
| 4/2004 | 3488 | $ 52,930.93 | Dr. Tarek Wehbe | 5/03/2004 | 45-980[redacted] | Tarek Wehbe | Circle - Savings |
| 4/2004 | 3446 | $ 350,000.00 | Tarek Wehbe | Unknown | Unknown | | |
| 3/2004 | 3539 | $ 500,000.00 | Dr. Tarek Wehbe | 5/18/2004 | 45-980[redacted] | Tarek Wehbe | Circle - Savings |
| 6/2004 | 3911 | $ 850,000.00 | Tarek Wehbe | 9/07/2004 | 45-980[redacted] | Tarek Wehbe | Circle - Savings |
| 8/2004 | 4222 | $ 1,300,000.00 | Tarek Wehbe | 12/08/2004 | Cashed | | |
| 0/2005 | 4574 | $ 700,000.00 | Tarek Wehbe | 3/30/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 7/2005 | 4799 | $ 200,000.00 | Tarek Wehbe | Unknown | Unknown | | |
| 7/2005 | 4800 | $ 500,000.00 | Tarek Wehbe | 5/31/2005 | 1564-9[redacted] | Tarek & Mathilda Wehbe | Circle Gold - Checking |
| 2/2005 | 4940 | $ 200,000.00 | Tarek Wehbe | 7/12/2005 | 1564-9[redacted] | Tarek & Mathilda Wehbe | Circle Gold - Checking |
| 5/2005 | 5036 | $ 300,000.00 | Tarek Wehbe | 8/08/2005 | 994-9[redacted]4-4 | Tarek Wehbe | Circle Gold - Checking |
| 3/2005 | 5092 | $ 200,000.00 | Tarek Wehbe | 8/24/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 0/2005 | 5225 | $ 350,000.00 | Tarek Wehbe | 10/03/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 6/2005 | 5337 | $350,000.00 | Tarek Wehbe | Unknown | Unknown | | |

76. As set forth in the chart above, the a number of the transactions are checks from the RMG account to Citizen Bank account 994-984-4, the property described in paragraph 4(a) above. There is evidence of concealment associated with this account. For example, on December 8, 2004, $1.3 million was withdrawn from the RMG account and $200,000 of that was put in the 994-984-4 account, and the remainder was put into another of Dr. Wehbe's accounts. There was no activity on the other account until December 8, 2004, when $613,572.80 was withdrawn from that other account and disbursed to another payee. Subsequently, there was no activity on the other account until January 26, 2005, when $30,000 was withdrawn from that other account and disbursed to a Dr. Wehbe's 1564-9[redacted] account. Subsequent, there was no activity on the other account until March 1, 2005, when $370,000 was transferred from that other account to the 994-984-4 account.

77. In 2004, a total of at least $4,459,167.86 was transferred from RMG Citizens account 1103-411-4 into multiple personal accounts controlled by Dr. Wehbe. In 2005, a total of at least $2,800,000 was transferred from RMG Citizens account 1103-411-04 to personal accounts controlled by Dr. Wehbe. In 2006, a total of at least $2,251,310.49 was transferred from RMG Citizens account 1103-41104 to various personal accounts controlled by Dr. Wehbe. Based on the information contained in this Affidavit, there is probable cause and a reasonable basis to believe that these transfers constitute proceeds traceable to unlawful activity by Dr. Wehbe and RMG, and are therefore subject to seizure pursuant to 18 U.S. C. §981(a)(1).

78. Further, based on my training and experience, I believe that Dr. Wehbe's pattern of withdrawing and cashing large sums of money from the RMG Account and re-depositing funds into various personal accounts, including the Wehbe account, and accounts owned by companies in which Dr. Wehbe has an interest (such as the Atlantis Management account), may be done in order to conceal the source and the nature of the funds, in violation of 18 U.S.C. §1956(a)(1). Based on my review of financial records, on numerous occasions, Dr. Wehbe routed money from the RMG account to his personal accounts and then again to yet other personal accounts. On numerous occasions, Dr. Wehbe routed money from the RMG account to accounts belong to business entities in which he held a substantial or controlling interest. These entities then used the money to pay their operating expenses and as set forth below to make mortgage payments on the real property listed in paragraph 4 above.

79. As stated above during 2004 a total of at least $4,459,167.86 was transferred from RMG Citizens account 1103-411-4 to personal accounts controlled by Dr. Wehbe. Of the $4,459,167.86 transferred to personal accounts controlled by Wehbe $2,152,930.93 was transferred to Citizens account 45-980[redacted] in the name of Dr. Wehbe. On November 19, 2004, at least $330,308.80 was withdrawn from Citizens account 45-980[redacted] and utilized as a down payment at closing for the property known as 6 Pine Tree Lane, Lincoln, Rhode Island and described in Paragraph 4(d) above.

80. Of the at least $4,459,167.86 transferred from RMG Citizens 1103-411-4 to personal accounts controlled by Wehbe during 2004, at least $950,000 was transferred to Citizens Bank 66-661[redacted] in the name of Dr. Wehbe. On March 8, 2005 Citizens account 66-661[redacted] was closed by withdrawing the entire balance of $154,953.52. The closing withdrawal was applied to

Citizens Loan number 11704[redacted] on the property located at 566 East Shore Road, Jamestown, Rhode Island and described in Paragraph 4(c) above.

81. As stated above during 2005, at least a total of $2,800,000 was transferred from RMG Citizens account 1103-411-4 to personal accounts controlled by Wehbe. Of the $2,800,000 from RMG Citizens account 1103-411-4 transferred to personal accounts controlled by Wehbe $700,000 was deposited into Citizens account 1564-9[redacted] in the name of Dr. Wehbe. During 2005, at least $640,000 was transferred from Dr. Wehbe's Citizens account 1564-9[redacted] to Atlantis Management's Bank of America account 941-811[redacted]. On January 24, 2006 Atlantis Management wrote check #3087 from Bank of America account 941-811[redacted] in the amount of $200,000 to Washington Mutual Loan #90996050 for the property known as 1630 Mineral Spring Avenue described in Paragraph 4(b) above. This property is also one of the locations of RMG's medical offices.

82. As stated above during 2005, at least a total of $2,800,000 was transferred from RMG Citizens account 1103-[redacted] to personal accounts controlled by Wehbe. Of the $2,800,000 from RMG Citizens account 1103-[redacted] transferred to personal accounts controlled by Wehbe $700,000 was deposited into Citizens account 1564-[redacted] in the name of Dr. Wehbe. During 2005, at least $974,647.55 was transferred from Dr. Wehbe's Citizens account 1564-[redacted] to Summerfield Estates Citizens account 1636-305-1. On March 2, 2005, Summerfield Estates wrote check #0 in the amount of $656,208.39 payable to Citizens Bank. Notated in the memo section of check #0 was "Smithfield 1 Farnum Closing." My analysis does not reveal any Smithfield property or property on any street named "Farnum" owned by Mr. Wehbe or any of his companies aside from the 78 Farnum Pike property listed in Pargraph 4(f) above. Therefore, based on this notation and my analysis, the $656,208.39 came from the RMG Citizens account, was deposited in one of Wehbe's personal accounts, and was then used to pay for the 78 Farnum Pike properties listed in Paragraph 4(f) above.

83. Of the at least $2,251,310.49 transferred from RMG Citizens account 1103-[redacted] to personal accounts controlled by Dr. Wehbe during 2006, $150,000 was transferred to Citizens account 1564-9[redacted] in the name of Wehbe. $46,000 was transferred from Wehbe's Citizens account 1564-9[redacted] Elegant Homes' Citizens account 1696-676-7. During 2006 over $40,000 was paid from Elegant Homes' Citizens account 1696-[redacted] to Loan #268763-60 at the Credit

Union Central Falls secured by the property located at 15 Dennell Dr., Lincoln, Rhode Island and described in Paragraph 4(e) above.

## VI. CONCLUSION

84. Based on the information contained in this Affidavit, there is probable cause and a reasonable basis to believe that from at least January 2002 to the present, Dr. Wehbe has knowingly and willfully executed a scheme and artifice to defraud health care benefit programs, to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of the Medicare, Medicaid, and private health care programs, in connection with the delivery and or payment for health care benefits, items, and services, all in violation of 18 U.S.C. § 1347 (health care fraud). Similarly, there is probable cause and a reasonable basis to believe that for the same time period, Dr. Wehbe knowingly presented false, fictitious, and fraudulent claims to a department and agency of the United States, in violation of 18 U.S.C. §§ 287 (false claims), 1001 (false statements), and 1031 (false statements relating to health care matters). Furthermore, in light of the fact that Dr. Wehbe and RMG presented these false claims to the Carriers by means of electronic transmission, there is probable cause and a reasonable basis to believe that Dr. Wehbe and RMG committed wire fraud in violation of 18 U.S.C. § 1343. Finally, as all the Carriers, with the exception of Medicaid, paid RMG with checks delivered through the mail, based on false claims presented by Dr. Wehbe and RMG, there is probable cause and a reasonable basis to believe that Dr. Wehbe and RMG committed mail fraud in violation of 18 U.S.C. § 1341.

85. Based on the information contained in this Affidavit, there is probable cause and a reasonable basis to believe that financial transactions were conducted with Citizens Bank account 994-984-4 in the name of Dr. Wehbe, described in paragraph 4(a) above, knowing that the transactions were conducted with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities of health care fraud (18 U.S.C. § 1347) and mail fraud (18 U.S.C. § 1341) in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and that said account contains traceable proceeds from the above violations. Thus, all funds in this account are forfeitable to the United States pursuant to 18 U.S.C. §981(a)(1)(A) in that they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or constitute property traceable to such property. Furthermore,

based on my analysis, all funds remaining in this account – consistent with 18 U.S.C. § 984, including §§ 984(a)(1)(A) and (B) and 984(b) – are traceable proceeds from the above violations.

86. Based on the information contained in this Affidavit, there is probable cause and a reasonable basis to believe that financial transactions were conducted with respect to the purchase or ownership of the real property listed in paragraph 4(b)-(f) above, knowing that the transactions were conducted with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activities of health care fraud (18 U.S.C. §1347), mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1341) in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and that said the funds used to purchase or come into ownership of said property or maintain ownership of said property contains the traceable proceeds from the above violations or property traceable to such property.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Jason Rameaka
Special Agent
Internal Revenue Service